**LANZONE MORGAN, LLP**
**Jomo K. Stewart, SBN 197560**
jks@lanzonemorgan.com
**5001 Airport Plaza Drive, Suite 210**
**Long Beach, California 90815**
**Telephone: 562-596-1700**
**Facsimile: 562-596-0011**

Attorneys for Plaintiff, Moriah Zeigler

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| MORIAH ZEIGLER,<br><br>     Plaintiff,<br><br>  vs.<br><br><br>COUNTY OF SAN LUIS OBISPO;<br>COUNTY OF SAN LUIS OBISPO<br>DEPARTMENT OF SOCIAL<br>SERVICES;  SAN LUIS OBISPO<br>COUNTY SHERIFF'S<br>DEPARTMENT; TERI WARKENTIN,<br>an individual; DIANA STEINHAUER,<br>an individual; LINDA GENDRON, an<br>individual; DESILYN TRAHAN, an<br>individual; JOCELYN McCURRY, an<br>individual; GREGORY ROACH, an<br>individual; ALFREDO CAMPOS, an<br>individual; and DOES 1 through 100;<br>     Defendants. | Case No.:<br>Complaint Filed:<br>Assigned to Department:<br>Hon.<br><br><br>**COMPLAINT FOR DAMAGES AND**<br>**DEMAND FOR JURY TRIAL**<br><br>1. **Violations of Federal Civil Rights (42 U.S.C. § 1983)**<br>2. *Monell* **Claims**<br>3. **Violations of State Civil Rights (Cal. Const., Art I)**<br>4. **Violations of State Civil Rights (Cal. Civ. Code § 43)**<br>5. **Judicial Deception (Cal. Govt. Code § 820.21)**<br>6. **Failure to Comply with Mandatory Duties (Cal. Govt. Code § 815.6)**<br>7. **Intentional Infliction of Emotional Distress** |

COMES NOW, Plaintiff, who alleges upon information and belief as follows:

## JURISDICTION & VENUE

1.  This Complaint arises under the Federal Civil Rights Act, 42 U.S.C. § 1983. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a).

2.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted herein occurred in this District. Venue is also proper under 28 U.S.C. § 1391(b)(1) because all parties are subject to personal jurisdiction in this District and therefore "reside" in this District as that term is defined in 28 U.S.C. § 1391(c).

## THE PARTIES

3.  Plaintiff, MORIAH ZEIGLER (hereinafter referenced as "Plaintiff" or "ZEIGLER") is an individual who at all relevant times was domiciled in the County of San Luis Obispo, in the State of California. Plaintiff hereby demands a trial by jury.

4.  The Defendant, COUNTY OF SAN LUIS OBISPO ("the COUNTY") was at all relevant times and is a local public entity, as that term is defined in Government Code section 900.4.

5.  The COUNTY OF SAN LUIS OBISPO DEPARTMENT OF SOCIAL SERVICES ("SOCIAL SERVICES") was and is a local public entity and operating subdivision of the COUNTY.

6.  The SAN LUIS OBISPO COUNTY SHERIFF'S OFFICE ("the SHERIFF") was and is a local public entity and operating subdivision of the COUNTY.

7.  At all relevant times, Defendant TERI WARKENTIN ("WARKENTIN") was an individual who was an officer, agent, and employee of the COUNTY and of SOCIAL SERVICES.

8.  At all relevant times, Defendant DIANA STEINHAUER ("STEINHAUER") was an individual who was an officer, supervisor, agent, and employee of the COUNTY and of SOCIAL SERVICES. At each stage in the proceedings, from the initial seizure of

the children to the final report filed by her subordinate workers, Defendant STEINHAUER was required to consult with, oversee, direct, and agree with the steps taken by her subordinate social workers and investigators, including, but not limited to WARKENTIN, prior to the subordinate performing any tasks or actions. Moreover, each court report is required to be reviewed, approved, and cosigned by STEINHAUER before it is filed.

9.     At all relevant times, Defendant LINDA GENDRON ("GENDRON") was an individual who was an officer, agent, and employee of the COUNTY and of SOCIAL SERVICES.

10.     At all relevant times, Defendant JOCELYN McCURRY ("McCURRY") was an individual who was an officer, agent, and employee of the COUNTY and of SOCIAL SERVICES.

11.     At all relevant times, Defendant ALFREDO CAMPOS ("CAMPOS") was an individual who was an officer, agent, and employee of the COUNTY and of the SHERIFF.

12.     At all relevant times, Defendant GREGORY ROACH ("ROACH") was an individual who was an officer, agent, and employee of the COUNTY and of the SHERIFF.

13.     DOES 1 through 100 were officers, agents, and employees, or were otherwise able to act under color of law on behalf of COUNTY and its subdivisions, including but not limited to SOCIAL SERVICES and the SHERIFF.  By so acting under color of law, DOES 1 through 100 engaged in wrongful conduct which caused injuries to Plaintiff as alleged *infra*.

14.     Plaintiff is ignorant of the true names and capacities of those Defendants sued herein as DOES 1 through 100, and for that reason has sued such Defendants by such fictitious names. Plaintiff will seek leave of the Court to amend this Complaint to identify said Defendants once their identities are known.

15.     Plaintiff is informed and believes, and therefore alleges, that each Defendant designated as a DOE was responsible in any actionable manner for the events and happenings herein referred to, which proximately caused the injuries and damages to ZEIGLER as alleged *infra*.

3

COMPLAINT FOR DAMAGES

16.     Hereinafter, all references to "DEFENDANTS" refers to the aforementioned defendants, collectively.

## PLAINTIFF SATISFIED ALL PROCEDURAL REQUIREMENTS TO BRING THIS CLAIM AGAINST DEFENDANTS

17.     On September 29, 2017, ZEIGLER sent a Claim Against the County of San Luis Obispo form, compliant with Government Code section 910.4, generally alleging the conduct described *infra*.  The COUNTY received this claim on October 2, 2017.  The COUNTY denied the claim on November 16, 2017. Thus, Plaintiff has exhausted the government claim presentation process and the filing of this civil lawsuit is proper.

### SUMMARY OF FACTS

18. ZEIGLER was blessed with her first child, E.Z., born on April 7, 2016. Until the time of the child's unlawful seizure and separation from ZEIGLER on April 24, 2017, ZEIGLER and E.Z. shared all of the companionship, care, and comfort of mother and child. EZ had just celebrated his first birthday at the time of his removal from his mother.

19.     On or about April 24, 2017, ZEIGLER was smoking a cigarette outside the front of her home, with her mother, her half-brother, and E.Z. inside.  A stranger approached the home and began to initiate conversation with ZEIGLER.  ZEIGLER did not know who this person was, and so did not meaningfully engage this stranger in conversation.

20.     After approximately ten minutes, this stranger finally identified herself as a social worker with SOCIAL SERVICES.  Only later did ZEIGLER learn that this social worker was WARKENTIN.  WARKENTIN had no documentation of her role.

21.     After identifying herself, WARKENTIN asked to see E.Z.

22.     ZEIGLER readily complied.  She had her mother bring E.Z. outside and allowed WARKENTIN to look at E.Z.

23.     WARKENTIN roughly inspected E.Z.'s body.  She was not careful and gentle, as one would expect given E.Z.'s young age.  WARKENTIN lifted E.Z.'s clothing

and inspected his skin.   WARKENTIN handed E.Z. back to ZEIGLER and, upon information and belief, did not notice any bruising or marks.

24.     Apparently satisfied that there was no reason for concern, WARKENTIN turned away from the home with ZEIGLER holding E.Z.  WARKENTIN walked down the path away from the home.

25.     After WARKENTIN had walked a significant distance, at least 20 yards, she abruptly turned around and approached the house a second time.   WARKENTIN demanded to speak with ZEIGLER's fifteen-year old half-brother.   Again, ZEIGLER readily complied and had her mother go inside to find ZEIGLER's brother.

26.     ZEIGLER's brother went outside and spoke with WARKENTIN.   With nothing to hide, ZEIGLER, her mother, and E.Z. went inside the house.

27.     WARKENTIN spoke with ZEIGLER's minor brother alone for a few minutes.  After their conversation, ZEIGLER's brother returned inside the house and to his room.

28.     A full minute after ZEIGLER's brother returned inside, WARKENTIN burst through the door.  At no point did WARKENTIN ask for permission to enter ZEIGLER's home.  At no point did WARKENTIN demonstrate that she had a court order to enter the home.  At no point was WARKENTIN able to articulate that she had a compelling and exigent reason to enter the home.  Upon information and belief, WARKENTIN entered ZEIGLER's home for the sole purpose of looking for and even creating evidence that she could use to justify taking E.Z.

29.     Once inside, WARKENTIN ripped E.Z. from ZEIGLER's arms.   She proceeded to inspect him a second time, in the same rough manner.  She again lifted E.Z.'s clothing to inspect his skin, and pulled down on his diaper.  This second time, she stated that she found some marks on E.Z.'s back that were not there before.  She immediately concluded they were caused by physical abuse.

30.     WARKENTIN began to question ZEIGLER about how the marks were created.  However, WARKENTIN would not allow ZEIGLER to answer one question

COMPLAINT FOR DAMAGES

before asking another.  WARKENTIN's rapid-fire questioning confused and tripped up ZEIGLER, who was left unable to respond to any one question.

31.    If WARKENTIN had allowed ZEIGLER to complete a thought, ZEIGLER would have been able to explain that E.Z. had pulled himself out of his walker earlier that day and fell.  Instead, WARKENTIN asked a series of questions and later claimed that ZEIGLER's responses were inconsistent with how the marks appeared on E.Z.'s lower back.

32.    In addition, WARKENTIN picked up cigarette butts from the ashtray outside the home, where ZEIGLER was smoking cigarettes earlier, and moved those cigarette butts inside next to the table where E.Z.'s food was sitting.

33.    After WARKENTIN was able to fabricate a story of abuse, she declared that she needed to call her supervisor.

34.    WARKENTIN returned E.Z. to ZEIGLER and walked outside the home to make phone calls.  These phone calls lasted ten to fifteen minutes.  During this time, WARKENTIN allowed ZEIGLER to remain alone with E.Z.  Upon information and belief, WARKENTIN did not actually believe that E.Z. was in any real or immediate danger, and believed that E.Z. would be safe with ZEIGLER while WARKENTIN called her supervisor.

35.    After approximately ten to fifteen minutes, WARKENTIN returned inside the home.  Again, WARKENTIN did not have consent to enter, nor did she request it. WARKENTIN had not obtained a court order to enter, and as she had just left ZEIGLER alone with E.Z., there was no imminent danger of physical harm to justify entering without a warrant.

36.    WARKENTIN announced that the police were on their way and the COUNTY is taking E.Z.  WARKENTIN physically removed E.Z. from ZEIGLER, and instructed her to prepare clothing for E.Z.  Distraught and unsure about what was happening, ZEIGLER complied.

37.    In the confusion and while packing E.Z.'s bag, ZEIGLER wanted to check

6

COMPLAINT FOR DAMAGES

on E.Z. and make sure he was safe.  WARKENTIN held E.Z.  ZEIGLER reached for E.Z., but WARKENTIN, turned sharply away to prevent ZEIGLER from having any physical possession or physical contact with E.Z.

38.  Shortly thereafter, WARKENTIN's supervisor, STEINHAUER, arrived. STEINHAUER promptly walked inside.  STEINHAUER did not have consent, nor did she ask for it.  STEINHAUER did not have a court order.  Upon information and belief, STEINHAUER was there only to supervise and did not know whether there was an imminent danger of physical harm.

39.  STEINHAUER did not say anything.  STEINHAUER did not even question WARKENTIN or ZEIGLER to ensure she understood the situation.  STEINHAUER took no affirmative action to ensure E.Z.'s safety.   STEINHAUER simply allowed WARKENTIN's conduct to continue.

40.  Not long thereafter, in response to WARKENTIN'S threats, police officers CAMPOS and ROACH arrived at the home.

41.  CAMPOS and ROACH also entered the home.  CAMPOS and ROACH did not have consent, and they did not request it.  CAMPOS and ROACH did not have a court order.  CAMPOS and ROACH could not articulate any particular exigent circumstances that would have allowed them to enter ZEIGLER's home.  At the time CAMPOS and ROACH entered, WARKENTIN was talking, albeit heatedly, with ZEIGLER and ZEIGLER's mother.

42.  Upon information and belief, CAMPOS and ROACH also did not feel as though E.Z. was any immediate danger.  Rather than taking steps to ensure E.Z.'s safety, CAMPOS and ROACH began taking photographs of the home.

43.  After CAMPOS and ROACH delayed ensuring E.Z.'s safety and instead took photographs, they discussed the next steps with WARKENTIN and STEINHAUER. WARKENTIN and STEINHAUER requested that CAMPOS and ROACH place E.Z. into protective custody, to then deliver E.Z. into the temporary custody of WARKENTIN, STEINHAUER, and SOCIAL SERVICES.  CAMPOS and ROACH agreed and placed

COMPLAINT FOR DAMAGES

E.Z. into this protective custody.

44.    Upon information and belief, WARKENTIN and STEINHAUER requested this protective custody to conceal their failure to obtain a warrant and resulting unlawful conduct.

45.    Upon information and belief, this procedure of obtaining protective custody to conceal the failure to obtain a warrant and other unlawful conduct was the policy of SOCIAL SERVICES and the resulting pattern and practice of SOCIAL SERVICES and its officers, agents, and employees, including WARKENTIN and STEINHAUER.

46.    Once WARKENTIN, STEINHAUER, CAMPOS, and ROACH had conspired to place E.Z. into protective custody, and announced their decision to ZEIGLER, she continued to assist with preparing him for his temporary placement.  While ZEIGLER was understandably upset, she still helped finished packing E.Z.'s bag.  She spoke to WARKENTIN to ask about what she needed to do to bring E.Z. home with her.

47.    In clear contradiction to the allegations of imminent danger requiring E.Z. to be placed in temporary custody away from ZEIGLER, ZEIGLER was permitted to place E.Z. in his car seat and to say goodbye.

48.    Even after E.Z. was taken away from his mother, SOCIAL SERVICES and its employees continued to maintain separation between ZEIGLER and E.Z.

49.    Shortly after ZEIGLER put E.Z. in his car seat and watched WARKENTIN drive away with him, SOCIAL SERVICES and its officers, agents, and employees ordered a Suspected Child Abuse and Neglect examination, without ZEIGLER's consent or awareness.  SOCIAL SERVICES officers, agents, and employees allowed this biased examination to repeat their theory that E.Z.'s bruises were created through hitting him and not by him falling.  This finding was used to justify the continued separation of E.Z. and ZEIGLER.

50.    On or about April 27, 2017, Social Worker GENDRON and supervisor TRAHAN prepared and signed the Detention Report filed with the Dependency court to justify the continued separation of E.Z. from his mother, ZEIGLER.  This report was based

virtually entirely on second-hand statements from WARKENTIN, who did not sign this report.  Neither GENDRON nor TRAHAN had any personal knowledge of the allegations recorded in this Report, yet they both signed attesting to the Report's accuracy.  Upon information and belief, neither GENDRON nor TRAHAN spoke to WARKENTIN, STEINHAUER, or ZEIGLER before signing and filing this report.

51.   In further contradiction to the safety and wellbeing of E.Z., and inapposite to the Defendants' claims that E.Z. was safest in their protection, GENDRON arrived with E.Z. to a visit with ZEIGLER and her father at the Atascadero Zoo near the end of June 2016 and had E.Z. in a car seat inappropriate for his weight and size. ZEIGLER informed GENDRON E.Z. required a car seat suitable for his weight, age, and size, to which GENDRON taunted ZEIGLER by stating she was forced to provide an inappropriate car seat because of ZEIGLER'S parenting skills. Thereafter,  GENDRON closed the doors of the vehicle and left E.Z. inside with the windows up in the 106-degree weather, while she continued to unnecessarily reprimanded ZEIGLER.

52.   Upon information and belief, ZEIGLER is informed and believes and therefore alleges, that additional individuals identified herein as a "DOES" were responsible, or contributed in some other actionable manner, for the events and happenings referred to herein which proximately caused injury to ZEIGLER and E.Z.

**FIRST CAUSE OF ACTION**
**VIOLATION OF FEDERAL CIVIL RIGHTS**
**(Pursuant to United States Code, Title 42, § 1983)**
**[By ZEIGLER against Defendants the COUNTY, SOCIAL SERVICES, WARKENTIN, STEINHAUER, CAMPOS, ROACH, GENDRON, TRAHAN, and DOES 1 through 100]**

53. Plaintiff hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

54.   Prior to April 24, 2017, ZEIGLER lived with her mother, her step-father, her younger half-brother, and ZEIGLER's one-year-old son ("E.Z.").

COMPLAINT FOR DAMAGES

55.    At all relevant times, GENDRON, TRAHAN, GENDRON, and TRAHAN acted under color of their authority as SOCIAL SERVICES officers, agents, and employees in their roles as social workers.

56.    At all relevant times, CAMPOS and ROACH acted under color of their authority as officers, agents, and employees of the SHERIFF.

57.    Under the Fourth Amendment to the United States Constitution, ZEIGLER enjoys the right to be free from unreasonable searches and seizures.  Therefore, each time the named DEFENDANTS entered ZEIGLER's home or seized E.Z., a showing of reasonableness was required.  Reasonableness can be shown by obtaining consent, by obtaining a court order (a warrant), or by a showing of exigent circumstances where the named DEFENDANTS were aware of an articulable imminent risk of physical harm to E.Z.

58.    WARKENTIN showed that she was capable of following this Constitutional requirement.  When WARKENTIN first approached ZEIGLER, she did not cross the threshold of ZEIGLER's home for a significant period of time.  When she first examined E.Z., WARKENTIN first received consent from ZEIGLER, which ended when WARKENTIN returned E.Z. to ZEIGLER.  WARKENTIN demonstrated that she was actually aware of the limits of her Constitutional authority as a SOCIAL SERVICES officer, agent, or employee.

59.    However, the April 24, 2017 incident soon devolved into a series of unconstitutional searches and seizures.  By way of example:

     a.    Upon entering ZEIGLER's home, WARKENTIN searched for and seized E.Z. by grabbing him and inspecting him for marks. WARKENTIN had already inspected E.Z. and had not found any evidence of wrongdoing.  Although WARKENTIN had previously asked for consent to hold E.Z., this was limited in scope, and was not continuing.

     b.    This seizure of E.Z. was for the sole purpose of inspecting him for a

COMPLAINT FOR DAMAGES

second time.  WARKENTIN did not request and did not obtain consent for this second search or seizure.

c.    In addition to seizing E.Z., WARKENTIN seized cigarette butts from ZEIGLER's porch, where they were not evidence of wrongdoing. WARKENTIN then moved these cigarette butts to inside where she could claim they were evidence of neglect.

d.    After this search and seizure of E.Z., WARKENTIN then left the home to make phone calls and returned ten to fifteen minutes later. WARKENTIN did not receive permission to re-enter the home. WARKENTIN did not use this ten to fifteen minutes to obtain a warrant.  WARKENTIN clearly did not believe there were exigent circumstances, as she left ZEIGLER alone with E.Z. for this full amount of time.

e.    When STEINHAUER arrived to the home, she did not request ZEIGLER's consent to enter, she simply entered.  She did not have a warrant to make that entry.  Upon information and belief, she did not believe there was any exigent circumstances to justify her entry as she simply observed.  She did not take any steps to ensure that E.Z. was being placed into a safe environment, she simply observed WARKENTIN.

f.    When CAMPOS and ROACH arrived to ZEIGLER's home, they also entered without requesting and therefore without obtaining consent. They did not believe there was any danger of imminent harm because they were able to take photographs before taking any action with regard to E.Z.

g.    Despite not properly being in ZEIGLER's home and therefore not having reason to take E.Z. from ZEIGLER, CAMPOS and ROACH proceeded to authorize protective custody at the request of

11

COMPLAINT FOR DAMAGES

WARKENTIN and STEINHAUER.  This allowed all the named DEFENDANTS to participate in the continuing seizure of E.Z. from his mother, ZEIGLER.  Again, there were no exigent circumstances, as the named DEFENDANTS allowed ZEIGLER to place E.Z. in his car seat and therefore did not believe she was a danger to E.Z.  She could not have consented to this last seizure on April 24, 2017, as DEFENDANTS' actions placed ZEIGLER under duress.  (Cal. Civ Code § 1569(a), "Unlawful confinement of the . . . descendant" of the party claiming to be duress.)

60.    In all of the above examples, the named DEFENDANTS were acting under the color of their authority as social workers and as Sheriff's deputies.  They informed ZEIGLER that she did not have a choice in the matter, but that E.Z. would be removed from her home.

61.    At all times relevant to the allegations of this Complaint, ZEIGLER's right to familial association, guaranteed under the First and Fourteenth Amendments to the United States Constitution, was "clearly established" such that any reasonable social services agent or other employee of THE COUNTY would know it to be unlawful to seize a child from the care, custody, and control of its parents in the absence of exigent circumstances and without first obtaining a warrant.

62.    Moreover, any such reasonable social worker would know that to do so would constitute a violation of the parents' and children's well-elaborated constitutional right to live together without governmental interference – a fundamental right protected under the First and Fourteenth Amendments to the United States Constitution.

63.    Furthermore, any such reasonable social worker would know that performing such an unlawful search and seizure would similarly, constitute a violation of the child's long-established constitutional right to be free from seizure by a governmental actor without prior judicial authorization, a fundamental right protected under the Fourth and Fourteenth Amendments to the United States Constitution.

COMPLAINT FOR DAMAGES

64.     Defendants, the COUNTY, SOCIAL SERVICES, WARKENTIN, STEINHAUER, CAMPOS, ROACH, GENDRON, and TRAHAN, and each of them, had at all times relevant herein, an affirmative duty and obligation to recognize, acknowledge, and respect ZEIGLER's rights, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate the rights guaranteed to ZEIGLER under the United States Constitution, including, without limitation, the right to privacy, family integrity, and the right to familial relations.

65.     Defendants, the COUNTY, SOCIAL SERVICES, WARKENTIN, STEINHAUER, CAMPOS, ROACH, GENDRON, and TRAHAN were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired, to violated ZEIGLER's constitutional rights by, not limited to, searching an thereafter, snatching E.Z. from the care, custody, and control of his mother, without proper or just cause or authority, in the absence of any exigency, and without first obtaining a warrant or other court order. This warrantless search and subsequent seizure without exigent circumstances violated ZEIGLER's rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution.

66.     At the time of the search and seizure, or at any point in time, there was no immediate threat to the child's health or safety. Despite such WARKENTIN and STEINHAUER did not bother to seek a warrant, or attempt to pursue some other less intrusive alternative means to "protect" the child other than immediately seizing him from his mother's care.

67.     Neither WARKENTIN nor STEINHAUER had any reasonable basis to believe that E.Z. was in imminent danger of sustaining serious bodily injury or death within the time it would have taken WARKENTIN or STEINHAUER to obtain a warrant authorizing the search and seizure.

68.     Neither WARKENTIN nor STEINHAUER had any reasonable basis to believe that E.Z. was in imminent danger of sustaining serious bodily injury or death in ZEIGLER's care within the time it would have taken WARKENTIN or STEINHAUER,

COMPLAINT FOR DAMAGES

or any other SOCIAL SERVICES employee, to obtain a warrant authorizing the search and seizure.

69.     Upon information and belief, ZEIGLER, alleges that during a working day afternoon, and employee of the COUNTY and/or SOCIAL SERVICES could obtain a warrant from a judge of the Superior Court in approximately two hours. Alternatively, when a social worker at SOCIAL SERVICES believes that there exists probable cause to seize and remove a child from a parent's care, but there is no imminent threat to the child's safety, the social worker can petition *ex parte* for a non-custodial removal – a procedure expressly authorized by California statute.

70.     Neither WARKENTIN nor STEINHAUER, nor any other employee of the COUNTY or SOCIAL SERVICES obtained a warrant to search ZEIGLER'S home and remove E.Z. from his mother's custody and care.

71.     Neither WARKENTIN nor STEINHAUER, nor any other employee of the COUNTY or SOCIAL SERVICES, filed or sought a non-custodial removal petition from the Superior Court before seizing E.Z. from ZEIGLER's care and custody.

72.     Despite having no specific, reasonable, or articulable evidence that E.Z. was in imminent danger of sustaining serious bodily injury or death within the short amount of time it would have taken to obtain a warrant, DEFENDANTS, and each of them, searched ZEIGLER'S home and seized and detained E.Z.

73.     In addition, the First and Fourteenth Amendments to the United States Constitution guarantee the fundamental right of familial association between parents and their children.  As this is a fundamental right, the state actors must have a compelling reason for its action depriving ZEIGLER of her right to association with E.Z., and their action must be as narrowly tailored as possible to achieve the state goal of protecting E.Z.

74.     By way of example, the named DEFENDANTS violated ZEIGLER'S right to intimate association with her son, E.Z., in ways which include but are not limited to:

        a.     While ZEIGLER was packing a bag for E.Z., believing that complying with WARKENTIN's orders would make the process easier and would

COMPLAINT FOR DAMAGES

help reunite her with E.Z. sooner, ZEIGLER wanted to retain custody of her son.  When she attempted to reach out for E.Z., WARKENTIN turned her back on ZEIGLER to ensure that ZEIGLER could not access her son and, in fact, could no longer see him.

b.  The named DEFENDANTS left ZEIGLER's home with E.Z. This resulted in a prolonged interruption of ZEIGLER's right to familial association with E.Z.  Her only contact with E.Z. after April 24, 2017 has been supervised by SOCIAL SERVICES and its officers, agents, and employees.

c.  Shortly after this seizure, SOCIAL SERVICES subjected E.Z. to a SCAN exam.  This exam was done without ZEIGLER's consent for the purpose of the continuing violation of ZEIGLER's right to associate with E.Z.

d.  On or about April 27, 2017, GENDRON and TRAHAN falsely ratified a Detention Report and Petition in which they claimed personal knowledge despite basing this Report entirely on the secondhand statements of WARKENTIN.  GENDRON and TRAHAN did not confer with WARKENTIN or with ZEIGLER prior to signing and filing this Report which was also used to justify the ongoing interference with ZEIGLER's right to familial association with E.Z.

75.  The right to familial association under the 14th Amendment to the United States Constitution includes the right to govern the medical care one's child receives. Inclusive of such a right is the right to be provided notice and an opportunity to object or attend a medical appointment of one's child.

76. Throughout the period of time that COUNTY had care, custody, and control of E.Z., they were required under state and federal law to give advance notice to ZEIGLER, and the opportunity to attend, any medical appointments, treatments, or procedures that may occur, or be considered necessary for E.Z., before E.Z. actually

15

attended or underwent such treatments or procedures.

77. Despite knowledge of these law and despite the absence of any court order placing limitations on ZEIGLER's right to make medical decisions pertaining to her son, during the time E.Z. was in the care, custody, and control of COUNTY, SOCIAL WORKERS took E.Z. to medical appointments and underwent highly invasive treatments and medical procedures.

78. The acts listed above also constitute a violation of ZEIGLER's right to substantive due process under the Fourteenth Amendment of the United States Constitution.

79. The specific examples of DEFENDANTS' violations of ZEIGLER's Federal Constitutional rights set forth *supra* are not meant to limit the numerosity of the allegations contained herein, but are simply illustrative of the depth of DEFENDANTS' malicious, oppressive, fraudulent, and reckless conduct.

80. DEFENDANTS each willfully, intentionally, and/or recklessly caused or permitted ZEIGLER's rights to be violated as set forth *supra*.

81. DEFENDANTS' actions, as alleged *supra*, created circumstances or conditions likely to cause injury and which did, in fact, cause injury to ZEIGLER. DEFENDANTS' actions were the direct, actual, legal, and proximate cause of ZEIGLER's injuries.

82. Because of the malicious, oppressive, and fraudulent nature of the individual DEFENDANTS' conduct, an award of punitive damages in an amount according to proof at trial is therefore justified and appropriate pursuant to 42 U.S.C. § 1983, 1988.

## SECOND CAUSE OF ACTION
### *MONELL* RELATED CLAIMS
**[By ZEIGLER against the COUNTY and SOCIAL SERVICES]**

83. Plaintiff hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

84. Defendant, THE COUNTY, including through its child welfare services

COMPLAINT FOR DAMAGES

agency, is a "person" within the meaning of 42 U.S.C. § 1983 and subject to civil liability pursuant to the doctrine outlined in *Monell v. Dept. of Social Services* (1978) 436 U.S. 658. DEFENDANTS, and each of them, acted under color of state law when committing the acts alleged herein, in violation of the rights of ZEIGLER.

85.    As the employer of Sheriff's deputies, social workers and their supervisors, COUNTY had primary responsibility for the training, education, and supervision of sheriff's deputies, social workers, emergency response workers, supervisors, program managers, dependency intake workers, placement workers, and all other COUNTY and SOCIAL SERVICES personnel.

86.    Defendant the COUNTY, including through its entity SOCIAL SERVICES, established and/or followed policies, procedures, customs and/or practices (collectively referred to as "policy" or "policies"), where these policies were the driving force behind the violations of Plaintiff's Constitutional rights, including those arising under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.   These policies include but are not limited to:

      a.    The policy, practice, and procedure of removing children without a warrant or exigent circumstances;

      b.    The policy and practice of failing to conduct a reasonable investigation and evaluating less intrusive means to ensure a child's safety;

      c.    The policy and practice of failing to notify the parents of medical appointments;

      d.    The policy of unlawfully entering houses for the sole purpose of finding evidence to justify the removal of a child from its parent.

      e.    The policy of tampering with evidence to make a more compelling justification for removing a child from its parent.

      f.    The policy of informing parents that they must comply with the removal of their child, even though the removal is tainted by a series of knowing Constitutional violations.

COMPLAINT FOR DAMAGES

g.    The policy of requesting police take children into protective custody instead of requesting court orders as a way to further intimidate parents into acquiescing to the removal of their children.

h.    The policy of requesting police take children into protective custody instead of requesting court orders even though by taking the time to make the police request, there is clearly enough time to request the court order in advance.

87.    The COUNTY had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all of its agents, officers, employees, and those acting under them, including within SOCIAL SERVICES, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of ZEIGLER in order to avoid causing the injuries and damages alleged herein.

88.    Moreover, based upon the duties charged to the COUNTY, including the powers to seize children from their parents' care, THE COUNTY, and its policymaking officials, knew or should have known of the need to establish customs, policies, and practices required to protect the aforementioned civil rights of parents and their children with whom their SOCIAL SERVICES agents regularly came into contact.

89.    THE COUNTY established, adopted, followed, and implemented or turned a blind eye, to customs and practices which were followed, complied with, and carried out by SOCIAL SERVICES, when the rights of ZEIGLER were violated by searching and seizing without a warrant or court order and in the absence of any exigency or parental consent.

90.    At the time of the underlying events, the regularly established customs and practices of the COUNTY and SOCIAL SERVICES that were followed, adhered to, complied with, and carried out by DEFENDANTS, were the moving force, that is, the actual, direct, and proximate cause of the violations of ZEIGLER's constitutional rights including, but not limited to:

18

COMPLAINT FOR DAMAGES

a. The custom and practice of detaining and removing children from their family and homes without imminent danger of serious bodily injury, prior court order, or consent;

b. the custom and/or practice of removing and detaining children, and continuing to detain them for an unreasonable period long after any alleged basis for detention is negated;

c. the unwritten policy of acting with deliberate indifference to the rights of children and parents with whom SOCIAL SERVICES agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, when performing actions related to child abuse and dependency type investigations and court proceedings; and

d. the consistent failure by THE COUNTY to investigate violations of constitutional rights by social workers, and consistent failure to discipline social workers and their supervisors involved in constitutional violations so that violations of children's constitutional rights were not only accepted, but were customary.

91.    The above list is not exhaustive because of the privileged and protected records of investigations relating to juvenile dependency proceedings. Plaintiff may seek

COMPLAINT FOR DAMAGES

leave to amend this Complaint as additional information becomes available during the court of discovery.

92.    Upon information and belief, THE COUNTY and SOCIAL SERVICES has engaged in each of the customs and/or practices identified above and continues to engage in said practices on an ongoing and daily basis.

93.    Moreover, THE COUNTY is aware that its social workers seize children from the care of their parents without first obtaining judicial authorization when there is no emergency circumstances and in contravention of the rights of both parents and children.

94.    Nevertheless, THE COUNTY has made a knowing and conscious decision to refrain from promulgating policies to prevent such misconduct, and has consistently and knowingly failed to provide any training to members of SOCIAL SERVICES to the effect that they must first obtain a warrant before seizing children from their parents when no exigency exists.

95.    THE COUNTY's decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above - the known need for a specific policy prohibiting its social workers from seizing children from their parents without a warrant or emergency - is itself a "policy" decision which constitutes a policy of deliberate indifference.

96.    This policy of deliberate indifference, and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the Plaintiff's harm, in that SOCIAL SERVICES both followed and acted pursuant to the regularly established customs, practices, and well known and accepted standard operating procedures when they literally seized E.Z. from ZEIGLER, without first obtaining judicial authorization or parental consent and in the absence of any threat of immediate risk of serious bodily injury.

97.    None of the constitutional violations complained of and set forth above would have happened if THE COUNTY had honored its obligation to promulgate

COMPLAINT FOR DAMAGES

policies and train its social workers of the crucial constitutional prescriptions which govern their daily work.

98.     At all times relevant to the  allegations herein, up to and  including the time of filing, Plaintiff is informed and believes and on that basis  alleges that:

> a. THE COUNTY has  no written  policy, procedure,  custom, practice and/or training regarding the  circumstances under which  a county social worker must obtain judicial authorization prior  to removing a child from the  custody of its   parent(s);
>
> b. THE COUNTY has  no written policy,  procedure, custom, practice and/or training requiring a county social worker to   obtain judicial authorization prior  to  removing  a child from  the custody of  its parent(s), when there was no evidence that the child was in  immediate risk of suffering serious bodily injury;
>
> c. THE COUNTY  has no written  policy, procedure, custom, practice and/or training delineating the constitutional  protections afforded to a parent and child by the  First Fourth, and Fourteenth Amendments; and
>
> d.  THE COUNTY has no written policy, procedure, custom, practice and/or training  instructing that a county social worker must possess "specific,  articulable  evidence"  that  a  child  would  be  placed  at imminent risk of suffering serious harm at the hands of the     parent(s), prior to removing the child from its parent's custody without judicial authorization.

99.     By deliberately refraining from promulgating any of the policies, procedures, customs, practices and/or training, THE COUNTY permitted the aforementioned basic policy decisions to be made by the lower level social workers. As a result, THE COUNTY'S policy, custom, and/or practice -   as established, adopted, and implemented by the SOCIAL SERVICES-    was and is to seize children from their parents without judicial authorization or parental consent, and without specific, reasonable, and articulable

COMPLAINT FOR DAMAGES

evidence to suggest that the children are in immediate risk of suffering serious bodily injury.

100.   These policies, customs, and practices that disregard the constitutional protections afforded to the most vulnerable citizens was a substantial factor in causing harm to the Plaintiff, as well as similar harm caused to thousands of other families.

101.   Thus, as a matter of law, because there was no formal policy preventing the misconduct described herein, even though one was obviously needed, the social workers on the line acted on behalf of the County in making final policy decisions -   which is exactly what they did when they searched ZEIGLER's home and unlawfully seized E.Z. without a warrant and in the absence of any exigency.

102.   The state of the law regarding the constitutional protections afforded to a parent and child by the First, Fourth, and Fourteenth Amendments was clearly established well before the time Plaintiff was unconstitutionally seized in April of 2017. As such, THE COUNTY knew before 2017 that its county social workers required training on the constitutional protections afforded to a parent and child.

103.   On information and belief, despite this knowledge, THE COUNTY deliberately failed to train its employees including SOCIAL SERVICES regarding the circumstances under which judicial authorization must be obtained prior to removing a child from the custody of its parent(s).

104.   Additionally, THE COUNTY deliberately failed to train its employees including members of SOCIAL SERVICES regarding the fact that judicial authorization must be obtained prior to the search of an individual's home and removal of a child from the custody of its parent(s), when there was no evidence that the child was in immediate risk of suffering serious bodily injury.

105.   THE COUNTY's deliberate failure to train its county social workers on these established constitutional protections was a substantial factor in causing ZEIGLER'S harm, in that the SOCIAL SERVICES agents working for THE COUNTY were unfamiliar with and oblivious to ZEIGLER'S constitutional rights, when DEFENDANTS seized E.Z.

COMPLAINT FOR DAMAGES

from his mother's care and custody without judicial authorization, parental consent, and in the absence   of exigent circumstances.

106.   Plaintiff is informed and believes that, THE COUNTY failed to investigate and failed to discipline any of the SOCIAL SERVICES agents involved, including but not limited to WARKENTIN and STEINHAUER, for unconstitutionally seizing E.Z. from his mother's custody without judicial authorization, parental consent, and without specific, reasonable, and   articulable evidence to suggest that she was in immediate risk of suffering serious bodily injury.

107.  Plaintiff is further informed and believes that, THE COUNTY never investigates or disciplines its social workers, including members of SOCIAL SERVICES, who seize children from their parents' custody without judicial authorization, parental consent, and without specific, reasonable, and articulable evidence to suggest that the child is in immediate   risk of suffering serious bodily injury.

108.  Plaintiff is informed and believes that the warrantless seizure by DEFENDANTS was not an isolated incident specific to her circumstances.   On the contrary, such warrantless and unlawful seizures are regular and recurring and are perpetrated daily by SOCIAL SERVICES in the same or similar circumstances.

109.   THE COUNTY, including by and through SOCIAL SERVICES, and its policymaking officials, breached its duties and obligations to ZEIGLER by, but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control, and review its agents  and employees as to their compliance with Constitutional safeguards; and by deliberately permitting the members of SOCIAL SERVICES, including Defendants WARKENTIN AND STEINHAUER, to engage in  the unlawful and  unconstitutional conduct as herein alleged with at total and deliberate indifference to the  rights  of affected children and mothers, including ZEIGLER.

110.   THE COUNTY knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that its agency

COMPLAINT FOR DAMAGES

policies, practices, customs, and usages would, and did, directly cause ZEIGLER to be injured and damaged by THE COUNTY's wrongful practices, or deliberate lack of official policies to prevent the known practices from occurring.

111.   These actions and inactions of THE COUNTY were the moving force behind, and direct and proximate cause of ZEIGLER'S injuries.

112.   ZEIGLER is informed and believes, and thereon alleges, that the COUNTY and one or more of the individually named defendant social workers and/or employees named above, were decision makers in the making and/or implementation of COUNTY policy with regard to the removal and continued detention of children in the course of an investigation by an employee into allegations of child abuse.

113.   Alternatively, they were the de facto decision makers on the decision to remove children, such as E.Z., from parents without need of supervisory approval, without a warrant, without exigent circumstances, and without consent.

114.   These and other policies of the COUNTY and of SOCIAL SERVICES were the direct, actual, legal, and proximate cause of injury to ZEIGLER.

### **THIRD CAUSE OF ACTION**
### **VIOLATIONS OF STATE CIVIL RIGHTS**
### **(Pursuant to Article I of the California Constitution)**
### **[By ZEIGLER against all DEFENDANTS]**

115.   Plaintiff hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

116.   The California Constitution incorporates and elaborates on many of the same rights as are protected by the United States Constitution.  By way of example, Article I of the California Constitution protects rights including but not limited to the right to due process (§ 7(a),) and the right to be free from unreasonable searches and seizures.

117.   As elaborated in paragraphs 56, 59, and 60 *supra*, the actions of the individual named DEFENDANTS violated the analogous federal rights.  California's rights are co-extensive with the Federal Rights.

COMPLAINT FOR DAMAGES

118.   As alleged *supra*, the COUNTY through its entity SOCIAL SERVICES equally engaged in the wrongful deprivation violations of ZEIGLER's rights under the California constitution as SOCIAL SERVICES operated with a variety of policies authorizing the conduct at issue.

119.   Further, the COUNTY through its entity the SHERIFF engaged in the wrongful deprivations of ZEIGLER's rights because of a policy of placing minors into protective custody to avoid a pre-deprivation judicial determination, regardless of whether protective custody was justified under the circumstances.

120.   These actions and policies were the direct, actual, legal, and proximate cause of ZEIGLER's injuries and damages, in an amount according to proof at trial.

121.   Because of the malicious, oppressive, and fraudulent nature of the individual DEFENDANTS' conduct, an award of punitive damages in an amount according to proof at trial is therefore justified and appropriate.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF STATE CIVIL RIGHTS
### (Pursuant to California Civil Code § 43)
**[By ZEIGLER against all DEFENDANTS]**

122.   Plaintiff incorporates by reference the proceeding paragraphs as though set forth fully herein.

123.   In addition to rights enumerated in the California constitution, California Civil Code section 43 ensures all persons have the right to have personal relations.

124.   The right to personal relations is elaborated at California Civil Code section 49. This right forbids, among other things, "[t]he abduction or enticement of a child from a parent."

125.   ZEIGELER also has a fundamental right under Article I, § 1 of the California Constitution to the care, custody, and control of their child. (*See Fenn v. Sherriff* (2003) 109 Cal.App.4th 1466, 1485)

25

126. Accordingly, the right to personal relations is analogous to the federal right to familial association and to freedom from seizure of one's children.

127. The individual DEFENDANTS' conduct elaborated at paragraph 59 with respect to the right to familial association equally applies to ZEIGLER's right to have personal relations with E.Z.

128. As alleged *supra*, the COUNTY through its entity SOCIAL SERVICES equally engaged in the wrongful deprivation violations of ZEIGLER's rights under California law as SOCIAL SERVICES operated with a variety of policies authorizing the conduct at issue.

129. Further, the COUNTY through its entity the SHERIFF engaged in the wrongful deprivations of ZEIGLER's rights because of a policy of placing minors into protective custody to avoid a pre-deprivation judicial determination.

130. These actions and policies were the direct, actual, legal, and proximate cause of ZEIGLER's injuries and damages, in an amount according to proof at trial.

131. Because of the malicious, oppressive, and fraudulent nature of the individual DEFENDANTS' conduct, an award of punitive damages in an amount according to proof at trial is therefore justified and appropriate.

## FIFTH CAUSE OF ACTION
## JUDICIAL DECEPTION
### (Pursuant to Government Code § 820.21)
**[By ZEIGLER against the COUNTY, SOCIAL SERVICES, WARKENTIN, GENDRON, TRAHAN, and DOES 1 through 100]**

132. Plaintiff incorporates by reference the proceeding paragraphs as though set forth fully herein.

133. Government Code section 820.21 creates liability for social workers and child protection workers who "conduct investigations or proceedings" when certain acts are committed maliciously. These acts include but are not limited to perjury, fabrication of evidence, and obtaining testimony under duress or undue influence. Malicious conduct

is committed either to cause injury or despicable conduct that is committed with a willful and conscious disregard of the rights of others.

134.    DEFENDANTS committed the following malicious acts with regard to ZEIGLER's case, which include but are not limited to:

a.    WARKENTIN's fabrication of evidence by moving cigarette butts from cigarettes which were smoked outside and away from E.Z. into the home and near his food.

b.    WARKENTIN's obtaining testimony by duress, which includes the unlawful confinement of ZEIGLER's descendant. (Civ. Code § 1569.) WARKENTIN held E.Z. and prevented ZEIGLER's access to her son while asking rapid-fire questions without giving ZEIGLER an opportunity to respond. This created a situation where ZEIGLER was already distressed, and then became increasingly confused, and where WARKENTIN could then take these answers out of context to use against ZEIGLER.

c.    WARKENTIN's obtaining testimony by undue influence, which includes WARKENTIN's using her position of authority over ZEIGLER as the social worker threatening to take away her son as well as WARKENTIN's taking advantage of ZEIGLER's very real distress at having her son taken away. Again, WARKENTIN held E.Z. and threatened to remove him while asking rapid-fire questions without giving ZEIGLER an opportunity to respond. This created a situation where ZEIGLER was already distressed and then became increasingly confused, and where WARKENTIN could then take these answers out of context to use against ZEIGLER.

d.    GENDRON and TRAHAN's perjury performed by signing the April 27, 2017 Detention Report despite their lack of personal knowledge and based entirely on the unverified secondhand account of a junior

COMPLAINT FOR DAMAGES

social worker.

135.   As alleged *supra*, the COUNTY through its entity SOCIAL SERVICES equally engaged in the malicious initiation of dependency proceedings as SOCIAL SERVICES operated with a variety of policies authorizing the conduct at issue.

136.   These actions and policies were the direct, actual, legal, and proximate cause of ZEIGLER's injuries and damages, in an amount according to proof at trial.

137.   Because of the malicious, oppressive, and fraudulent nature of the individual DEFENDANTS' conduct, an award of punitive damages in an amount according to proof at trial is therefore justified and appropriate.

## SIXTH CAUSE OF ACTION
## FAILURE TO COMPLY WITH MANDATORY DUTIES
### (Pursuant to Government Code § 815.6)
**[By ZEIGLER against the COUNTY, SOCIAL SERVICES, and DOES 1 through 100]**

138.   Plaintiff hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

139.   Government Code section 815.6 provides that "[w]here a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

140.   The COUNTY, through its subdivision and entity SOCIAL SERVICES, is under a mandatory duty not to interfere with parents' custody of their child unless certain conditions are met, which did not exist here.  (*See* Welf. & Inst. Code § 309.)

141.   The COUNTY, through its subdivision SOCIAL SERVICES, improperly interfered with ZEIGLER's custody of E.Z. in ways which include but are not limited to:

a.   Authorizing and allowing the policies which allowed WARKENTIN to enter ZEIGLER's home, seize E.Z., and search E.Z. in violation of

COMPLAINT FOR DAMAGES

ZEIGLER'S rights under the United States Constitution, the California constitution, and California statutes.

b.    Authorizing and allowing the policies which allowed WARKENTIN to tamper with evidence to justify her removal of E.Z. from ZEIGLER's custody.

c.    Authorizing and allowing the policies which allowed a supervising social worker to enter a home and observe without taking any steps to ensure that the child was safe and the parent's rights were safeguarded.

d.    Authorizing and allowing the policies of entering a home, collecting evidence, and then requesting law enforcement place a child into protective custody as a way to circumvent the judicial system.

e.    Authorizing and allowing the policies by which social workers may sign and approve a Detention Report despite having no personal knowledge of the facts contained therein.

142.   At all relevant times, the COUTY and SOCIAL SERVICES had a duty to comply with the regulations and requirements of the Regulations of the California Health and Human Services Agency, Department of Social Services, Child Welfare Services Manual Policies and Procedures. The regulations of the DSS Manual: (i) are regulations established by the DSS pursuant to California Welfare and Institutions Code § 16501; (ii) were duly adopted pursuant to the Administrative Procedures Act, California Government Code §§ 11340 *et seq.* and filed with the Secretary of State and therefore "have the force of law and are matters subject to mandatory judicial notice." (*Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 124, 145).

143.   By way of example, and without limitation, the COUNTY through its subdivision and entity, SOCIAL SERVICES, were required to ensure social workers, such as WARKENTIN, were trained and skilled in emergency response. (Department of Social Services, Child Welfare Services Manual of Policies and Procedures ("DSS Manual") section 31-101(.2).). But for the COUNTY and SOCIAL SERVICES' inability to follow

COMPLAINT FOR DAMAGES

proper emergency protocol, E.Z. would not have been unlawfully removed and kept from ZIEGLER.

144.   As further example, and without limitation, as part of the emergency response protocol, the COUNTY through its subdivision and entity, SOCIAL SERVICES, were required to complete, among other things, a report outlining and weighing factors for removal such as: the caretakers ability to care for child, any precipitating evidence, the child's characteristics, and family factors, among other things. Despite such an affirmative duty, there was no report inclusive of relevant and mandatory factors such as ZEIGLER's ability and desire to care for E.Z., the lack of any indication of prior abuse or neglect, the willingness and assistance of ZEIGLER's mother to assist with caring and providing for E.Z., and numerous other factors indicative of a capable and loving home environment.

145.   The COUNTY through its subdivision and entity, SOCIAL SERVICES, was required to ensure it had authority to remove a child prior to removal. (DSS Manual 31-135(.1).) Despite such a duty, the COUNTY and SOCIAL SERVICES deprived ZEIGLER of access to her son and removed E.Z. from her home without authority.

146.   These actions and policies were the direct, actual, legal, and proximate cause of ZEIGLER's injuries and damages, in an amount according to proof at trial.

## SEVENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

147.      Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 146, inclusive.

148.      ZEIGLER suffered extreme emotional distress as a result of outrageous conduct by the Defendants. Defendants' outrageous conduct included, but was not limited to:

a.   WARKENTIN's failure to identify herself upon arrival at ZEIGLER's home;

b.   WARKENTIN'S unauthorized entry into ZEIGLER's home;

c.   The unauthorized and unconsented removal and seizure of E.Z.;

30

       d.  The unauthorized and unconsented examination of E.Z.;

       e.  The planting of cigarette butts by WARKENTIN for the sole purpose of depriving ZEIGLER of her child;

       f.  Defendants' decision to remove E.Z. from ZEIGLER's custody, despite no evidence of physical abuse of any kind, and having no evidence that E.Z. was in imminent danger of serious bodily injury from ZEIGLER and;

       g.  The continuous wrongful separation of E.Z. from ZEIGLER.

149.   Defendants acted with the intention of causing, or in reckless disregard of the probability of causing emotional distress to ZEIGLER.

150.   ZEIGLER suffered severe and/or extreme emotional distress as a result of the invalid removal of E.Z. from the custody of ZEIGLER, the actual and proximate cause of which was Defendants' outrageous conduct.

151.   THE COUNTY is vicariously responsible for the conduct of the individually named defendants under Government Code section 815.2.

### **PRAYER FOR RELIEF**

1. For general damages according to proof against all DEFENDANTS;

2. For special damages according to proof against all DEFENDANTS;

3. For punitive damages against all individual DEFENDANTS;

4. For pre-judgment and post-judgment interest, according to law, against all DEFENDANTS;

5. For attorneys' fees against all DEFENDANTS;

6. For costs of suit against all DEFENDANTS;

///
///
///
///
///

COMPLAINT FOR DAMAGES

7.  For such other and further relief as the Court deems just and proper.

Dated:   December 29, 2017

Respectfully submitted,
LANZONE MORGAN, LLP


By:     /s/_____
              Jomo K. Stewart, Esq.
              jks@lanzonemorgan.com
              Attorneys for Plaintiff

COMPLAINT FOR DAMAGES